ROBERTSON, Justice:
James B. Cone and Christopher Linken-hoker were jointly indicted by the Forrest County grand jury at the July, 1971, term *454 for unlawful possession of marijuana. Cone was granted a severance. He was then tried, convicted and sentenced to serve a term of two years in the State Penitentiary and to pay a fine of $1,000.00.
Based on Johnson v. State, 260 So.2d 436 (Miss.1972), Cone filed a motion for resen-tencing and the Circuit Court reduced the sentence to six months in the county jail and $500.00 fine. Cone appeals from the conviction and sentence.
In December, 1970, Christopher Linken-hoker was assigned by the University of Southern Mississippi to Room 264 in Scott Hall, a men’s dormitory of the University of Southern Mississippi. For the fall quarter, 1970, Room 264 was occupied only by James B. Cone.
On May 20, 1971, a search warrant was issued for the search of “Room 264 Scott Hall, University of Southern Mississippi”. The room was searched on that day and two lids of marijuana were found in a black wooden box on the air-conditioning unit between the two beds. Ten lids of marijuana were found under some dirty clothes in a large cardboard box in the center of the room between the two beds. Linkenhoker was not in the room at the time the search was made, but Cone was. Cone admitted ownership of the black box, but testified that he knew nothing about the marijuana in it. He denied any knowledge of the marijuana found in the dirty clothes box and denied ownership of the clothes and the box.
There were six assignments of error. We have carefully studied and considered all of them. We feel that there is merit in assignment of error number 4, which is:
“The court below erred in sustaining the State’s objection to the testimony of Appellant’s witness, Douglas McKay, proctor of Scott Hall Dormitory, wherein the court concluded that such testimony was inadmissible.”
McKay, who was proctor of the second floor of Scott Hall, testified:
“Q Then was someone assigned to Jim Cone’s room?
“A Yes, Sir, there was.
“Q And who was that person ?
“A Chris Linkenhoker.
“Q And this would have been approximately when?
“A If it was during winter quarter, the beginning, it would have had to be in December.
“Q Now after Chris Linkenhoker was assigned to Jim Cone’s room, did Jim Cone ever approach you concerning the possibility that his roommate might have drugs in the room?
“A Yes, Sir, he did.
“BY HON. REX K. JONES :
If the Court please, we’re going to object to this. It’s self-serving and everything else.
“BY THE COURT:
Yes, I’m going to sustain. That wouldn’t have anything to do with this case.”
After this colloquy, defense counsel asked that the jury be excused, and the following testimony was elicited out of the. presence of the jury:
“Q Mr. McKay, did you receive, during the time that Chris Linkenhoker and James Cone were rooming together, did you receive any information concerning the possibility of drugs in Room 264?
“A Yes, Sir, I did.
“Q And from whom did you receive this information?
“A Jim Cone.
“Q Would you state, please, what person this information concerned?
*455 “A Well Jim came to me one night and he asked if he could talk to me, and I said all right, and he said he thought Chris might have had some form of drugs or narcotics in the room, and I said all right, then I’ll talk to him; and in the meantime, it bugged me because it’s part of my job to try not to let these things get in there, and I went and spoke with Mr. Oubre about it.
“Q Was that Mr. Willie Oubre, the security officer?
“A Yes, Sir.
“Q All right. Go ahead.
“A Yes, Sir, and after I had spoken with Mr. Oubre about it, I informed the head resident, Fred Horn, of what I was told by James Cone.
“Q Now did you receive this information in your official capacity as Proctor on the Second Floor of Scott Hall?
“A I would have to say both as a Proctor and as a friend.”
Still out of the presence of the jury, McKay was questioned as to the time of this statement by Cone:
“Q Do you recall approximately when it was that Jim Cone approached you with this information ?
“A I know it was after the new year. That’s all I can say is that it was after the new year.
“Q Was it before Jim Cone was arrested in May, 1971 ?
“A Yes, Sir.
“Q It was?
“A It was.”
Black’s Law Dictionary (Revised 4th Ed. 1968), at page 496, defines a self-serving declaration:
“One made by a party in his own interest at some time and place out of court;—not including testimony which he gives as witness at the trial.”
The general rule with reference to the admission into evidence of self-serving declarations is stated in 1 Wharton’s Criminal Evidence (12th Ed. 1955), § 285, pp. 657-659, which reads in part as follows:
“Declarations made by a defendant in his own favor, unless part of the res gestae, or of a confession offered by the prosecution, are not admissible for the defense. Self-serving declarations are excluded because there is nothing to guarantee their testimonial trustworthiness. Such declarations are excluded because more often than not they would lead to fabrication and falsehood, and would confuse rather than enlighten the jury. If such evidence were competent, anyone guilty of a crime could supply himself with evidence by making statements in his own behalf and favor which he could introduce in the trial of the crime with which he was charged, to show his innocence.” •
We do not feel that the statement of Cone to McKay, the proctor of the second floor of Scott Hall, was a self-serving declaration within the usual and real meaning of that term. It was not a statement of Cone about himself or in his own interest. As a resident on the second floor of Scott Hall, he merely reported to the student proctor in charge of the second floor that his roommate recently assigned by the University to his room “might have had some form of drugs or narcotics in the room.” The University had placed the responsibility on the dormitory proctors of keeping drugs out of the dormitories and Cone would appear to be doing what any responsible student should do, that is, report it to his dormitory manager. But the State argues that appellant Cone was preparing a built-in defense for himself. The same argument was advanced in the case *456 of Slaydon v. State, 102 Miss. 101, 58 So. 977 (1912), In Slaydon, this Court said:
“The doctrine applied by this court in the case cited [Johnston v. State, 101 Miss. 397, 58 So. 97 (1912)] is in line with the views of Mr. Wigmore in his great work upon the Law of Evidence. Speaking of the rule which excludes the acts and statements of the accused upon the ground that a party must not be allowed to ‘make evidence for himself,’ he says: ‘The notion of “making” — that is, “manufacturing” — evidence assumes that the statements are false, which is to beg the whole question. Then it is further suggested that at any rate the accused, if guilty, may have falsely uttered these sentiments, in order to furnish in advance evidence to exonerate him from a contemplated crime. But here the singular fallacy is committed of taking the possible trickery of guilty persons as a ground for excluding evidence in favor of a person not yet proven guilty; in other words, the fundamental idea of the presumption of innocence is repudiated.’ Wigmore on Evidence, vol. 3, § 1732.
“In the instant case, to exclude the evidence offered was to assume, first, the guilt of the accused; and, second, that he did and said these things in order to furnish an exoneration of himself of the crime then contemplated. It is hardly conceivable that defendant had planned the stealing of the steer for months before he actually stole him, and in preparation of a defense he roamed over the country searching for the steer and ‘making evidence for himself.’ The enforcement of such a rule is to deny the defendant the benefit of the presumption of innocence.” 102 Miss, at 112, 58 So. at 977-978.
It is hardly conceivable to us that Cone would invite a search of his room to prepare for the day that he might deal in drugs from this very room. As Wigmore says, such an interpretation repudiates the presumption of innocence.
We feel that the jury should have been allowed to hear and consider this testimony. The exclusion of this testimony constituted fatal error.
The judgment is reversed and the cause remanded for a new trial.
Reversed and remanded.
RODGERS, R J., and PATTERSON, INZER and BROOM, JJ„ concur.