# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-00395-SCT

*GARY DEAN LAMBERT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/1999 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | COVINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOE M. RAGLAND |
| | ROBERT O. WALLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | EDDIE BOWEN |
| NATURE OF THE CASE: | CIVIL - POST CONVICTION RELIEF |
| DISPOSITION: | REMANDED - 01/11/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/13/2001 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. Gary Dean Lambert appeals the denial of his motion for post-conviction collateral relief in the Circuit Court of Covington County, Mississippi. Lambert is serving a life sentence for the murder of Pearl Lott Trigg.

### STATEMENT OF THE FACTS

¶2. Lambert was discovered asleep and partially undressed beside the badly bruised body of Pearl Lott Trigg (Trigg) in the bedroom of Trigg's home on January 16, 1982. A checkbook with Lambert's name on it was found under Trigg's body, and Lambert's automobile was parked in the driveway of her home. No murder weapon was found. The cause of death was believed to be strangulation due to fracture of the hyoid bone (Adam's apple) and larynx. The time of death was not determined. Dr. John Smith, the pathologist who performed the autopsy on Trigg, found pubic hair inside the victim's larynx.

¶3. Lambert was indicted on January 18, 1982, two days after the crime and charged with capital murder while engaged in the commission of the crime of burglary of a dwelling house. He was convicted on August 6, 1982.

¶4. A critical witness against Lambert was Joe Andrews, a hair fiber specialist who testified for the State. He stated that hair removed from Trigg's larynx exhibited the same microscopic characteristics as the known pubic hair sample of Lambert or someone with similar hair characteristics. Hair removed from the hip, chin, and mouth of the victim also compared favorably with the known pubic hair of Lambert. However, since DNA testing was not instituted at the Mississippi Crime Laboratory until 1996, no DNA profile was performed on the hair samples.

¶5. The defense theory was that Lambert, in an advanced state of intoxication, was placed in Trigg's bedroom by some unknown person or persons. Sharon Jones, a blood alcohol specialist at the Mississippi Crime Lab, testified that blood taken from Lambert at noon following the discovery of Trigg's body at 9:00 a.m. revealed a blood alcohol content level of .08 percent.

¶6. The prosecution theorized that Lambert killed Trigg during the course of committing a sexual battery after breaking and entering. The State's investigation failed to produce any other arrests. The jury found Lambert guilty of murder less than capital, and the court sentenced Lambert to a life sentence.

¶7. Lambert originally appealed to this Court asserting four issues: the insufficiency of the indictment, wrongful admission of evidence, erroneously instructing the jury that it could find Lambert guilty of manslaughter, and failure to direct a verdict of not guilty. *Lambert v. State*, 462 So.2d 308 (Miss. 1984). In addition, Lambert, by supplemental brief pro se, argued that he was denied effective assistance of counsel at trial. An equally divided Court affirmed Lambert's conviction.

¶8. Lambert then sought habeas corpus in both the United States District Court and the United States Court of Appeals for the Fifth Circuit. The district court denied Lambert's request for habeas relief, and the Fifth Circuit affirmed the decision of the district court on September 9, 1992. *Lambert v. Mississippi Dep't of Corrections*, 974 F.2d 1334 (5th Cir. 1992)(table). The U.S. Supreme Court denied certiorari on April 5, 1993. *Lambert v. Mississippi Dep't of Corrections*, 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993).

¶9. Lambert filed a motion for post-conviction relief in 1998 pursuant to our order allowing him to proceed. The circuit court denied his requested relief, and Lambert now appeals asserting the following assignments of error:

> I. WHETHER THE COURT SHOULD REMAND FOR DNA TESTING OF HAIR SAMPLES.
>
> II. WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY RULING THAT LAMBERT'S EVIDENCE DID NOT SUPPORT A FINDING OF PERJURY AND FRAUD.
>
> III. WHETHER THE TRIAL JUDGE ERRED BY RULING THAT LAMBERT'S INDICTMENT WAS NOT VOID.
>
> IV. WHETHER THE ORIGINAL TRIAL COURT HAD JURISDICTION TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF SIMPLE MURDER.
>
> V. WHETHER THE TRIAL JUDGE ERRED BY RULING THAT LAMBERT WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

**STANDARD OF REVIEW**

¶10. The standard of review after an evidentiary hearing in post-conviction relief cases is well-settled: "We will not set aside such finding unless it is clearly erroneous. Put otherwise, we will not vacate such a finding unless, although there is evidence to support it, we are on the entire evidence left with the definite and firm conviction that a mistake has been made." *Rochell v. State*, 748 So.2d 103, 109 (Miss. 1999) (quoting **Reynolds v. State**, 521 So.2d 914, 917-18 (Miss. 1988)). However, "where questions of law are raised, the applicable standard of review is de novo." *Brown v. State*, 731 So.2d 595, 598 (Miss. 1999).

## DISCUSSION OF THE LAW

### I. WHETHER THE COURT SHOULD REMAND FOR DNA TESTING OF HAIR SAMPLES.

¶11. Lambert asks this Court to remand so that pubic hair removed from Trigg's larynx can be DNA tested. At Lambert's initial trial, an expert from the Mississippi Crime Laboratory testified that hair removed from Trigg had the same characteristics as Lambert's hair. Other hair samples did not match Trigg or Lambert. Lambert argues that the jury was greatly influenced by the expert's testimony and that modern DNA analysis would likely be more accurate.

¶12. The record establishes the following rather bizarre factual scenario. Lambert was at Nick's Ice House shooting pool and drinking beer from 6:30 p.m. until midnight on January 15, 1982. He left Nick's with Sharon Smith to go to a private party where he consumed ten beers, some whiskey, and smoked marijuana. A very intoxicated Lambert drove Smith home around 2:30 a.m. He ran into a ditch, drove across someone's yard, and nearly sideswiped a bridge on the way to Smith's home. Lambert dropped Smith off and found himself unable to drive any further. He pulled into a gas station to call a friend. While there, a man named Bob McLain, whom Lambert had met at the party, asked him for a ride. Lambert, knowing he was too drunk to drive, asked McLain to drive. This is the last memory Lambert has of the night. His next conscious memory is being awakened by Trigg's sons at 9:00 a.m. the following day and finding himself in bed with the deceased victim.

¶13. A more factually intensive account of the events which occurred in the early morning hours of January 16, 1982, was provided by defense witness Ricky Cook, whose relationship to Trigg's murder is suspicious at best. On May 10, 1982, Cook gave a statement to an investigator for the district attorney's office in which he admitted involvement in Trigg's murder. Cook stated that he and Trigg's "step-nephew" were in Lambert's car smoking marijuana the night of the murder and that Lambert was passed out in the backseat. The record before us is unclear whether the "step-nephew" was one and the same person as McLain. According to Cook's original statement, he and the step-nephew went to Trigg's home where the step-nephew then pulled a gun and told Cook "to go in the room and make love to the old lady." Cook stated that the step-nephew told him he would shoot him if he tried to leave. The step-nephew then held a gun on Cook while he had sex with Trigg. Afterwards, the step-nephew told Cook to kill Trigg. When he refused, the step-nephew choked and beat Trigg until she was dead. Cook stated that he and the step-nephew then "got [Lambert] out of the backseat of his car and we had to carry him. We put him in the bed with the old lady. We pulled [Lambert's] shirt off and shoes." The step-nephew then took Trigg's hand and scratched the faces of Lambert and Cook with her fingernails. Cook stated that when he and the step-nephew left, Lambert was asleep in the bed with Trigg's body.

¶14. Cook stated that the step-nephew then went around to the front door and kicked it in. The step-nephew and Cook rode around for about an hour before returning to visit a man and woman who lived in a

trailer in Trigg's yard. Cook stated that he stood outside the door of the trailer while the step-nephew went in to talk to the couple. Cook heard someone inside the trailer say "things could not have went any better."

¶15. Cook later testified that at the time he gave the statement, he believed it to be true. However, he later came to believe that the statement was the product of hypnosis. Cook testified that he had given the statement to the district attorney as a result of having been hypnotized by a tall dark stranger. Hypnosis aside, Cook admitted that he withdrew his statement after his mother and aunt advised him that they thought it would get him in trouble. At the time Cook withdrew his statement, he and Lambert's wife were having an affair.

¶16. At trial, defense counsel questioned Cook about his statement and had the statement marked for identification but objected when the district attorney attempted to introduce it into evidence. Lambert's defense throughout the case was that someone had placed him in the bed with Trigg's body; yet, his counsel objected to the introduction of a statement which supported that very theory. As Justice Dan M. Lee pointed out in his dissent, this trial tactic leads to questions of a claim of ineffective assistance of counsel. *Lambert v. State*, 462 So.2d at 321 (Lee, Dan M., J., dissenting).

¶17. Mary Turnage, Cook's ex-wife, gave a statement in January of 1998 corroborating the sworn statement given sixteen years earlier by Cook. Turnage stated that investigators allowed Cook and his mother to take containers home in order to collect hair and body fluid samples from Cook. Turnage stated that Cook's mother took hair and body fluid samples from her boyfriend and gave these false samples to the investigator for comparison. Cook never actually gave any hair or body fluid samples for comparison. Turnage also stated that she divorced Cook after he brutally beat and raped her to the point that she required reconstructive surgery. Further, Turnage said that Cook had confided in her that he had been involved in a couple of other murders and that Cook had prior convictions of assault and battery, drunk driving, and possession of marijuana.

¶18. Other matters in the pre-trial investigation are suspect. Justice Dan Lee stated in his dissent that "the police work done in the investigation of this homicide was almost unbelievably slipshod." The investigators failed to take scrapings from under the victim's fingernails or to make casts of tire tracks around Trigg's home. The investigators also failed to secure the crime-scene. The officers admitted that spectators and others driven by curiosity roamed freely through the house before it was ever sealed to the public. Harold Marx, the chief investigator, testified that he had even accidentally sent a pair of his own pants to the state crime lab for analysis, rather than Lambert's pants.

¶19. Lambert's direct appeal to this Court was affirmed by an equally divided court, indicating our concern regarding this man's guilt. Justice Dan M. Lee pointed out in his dissent that:

> Lambert was given a blood alcohol test at noon. That test revealed that he had a .08 blood alcohol content, thereby suggesting a massive ingestion of alcohol hours earlier. There was no evidence of seminal juices either in Mrs.Trigg's throat or vaginal area. There were hairs located on Mrs. Trigg's body and in her bed that could not be traced to her or Gary Dean Lambert. Even the State investigator admitted that the pubic hair found in Mrs. Trigg's throat could have been the result of her mouth being open as police investigators rolled her body around on the bed to take photographs.

*Lambert v. State*, 462 So.2d at 318 (Lee, Dan M., J., dissenting). Finally, no bruises or scratches were found on Lambert although Trigg had been brutally beaten and strangled.

¶20. Justice Lee summed up the facts and evidence of this case best by stating:

> When all of these elements are considered together outside the excitement and drama of the trial courtroom, I submit that there is a very strong possibility that the jury may have convicted an innocent man. . . . Where the facts supporting a verdict are as weak as they are in this case, and where the police investigation and handling of the evidence has been so lax that a police investigator actually sent his own pants for laboratory analysis, I would be loathe to affirm the commitment of a defendant to a term of life imprisonment.

*Id.* at 317 and 320.

¶21. Lambert now requests that the evidence used against him be subjected to modern DNA tests. In ***Polk v. State***, 612 So.2d 381, 388 (Miss. 1992) we stated that "DNA analysis has proven to be highly valuable in many areas -- for example, in resolving cases of disputed paternity. Its inestimable value, however, lies in its potential to provide identification in criminal cases bordering on the absolute." This Court previously affirmed Mr. Lambert's direct appeal in a 4-4 decision. While we respect precedent, reason must prevail when serious questions lead open minds to doubt whether the system has reached a just result. We are constrained to doubt the guilt of this man who has been sentenced to life in prison and believe that further investigation into the facts of this case may shed more light on the question of guilt or innocence. Looking at the entire evidence before us, we cannot say with definite and firm conviction that a mistake has not been made. The least we can do now is allow Lambert to apply modern science to the evidence used against him. Accordingly, we remand this case for entry of an order granting DNA analysis of the appropriate evidence.

¶22. We reserve addressing the other issues raised by Lambert at this time. However, Lambert may wish to bring these matters before this Court or a lower court at a later time, dependent upon the proof obtained pursuant to our holding today.

¶23. **DENIAL OF POST-CONVICTION RELIEF REMANDED.**

**BANKS, P.J., COBB AND DIAZ, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. PITTMAN, C.J., SMITH AND EASLEY, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. WALLER, J., NOT PARTICIPATING.**