# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-KA-00228-SCT

*JACKIE LEE HULL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/22/93 |
| TRIAL JUDGE: | HON. HOWARD Q. DAVIS JR. |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RABUN JONES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOLENE M. LOWRY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/19/96 |
| MOTION FOR REHEARING FILED: | 1/10/97 |
| MANDATE ISSUED: | 3/4/97 |

**BEFORE PRATHER, P.J., ROBERTS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. On February 4, 1993, a jury in the Circuit Court of Sunflower County convicted Jackie Lee Hull of the forcible rape of his fourteen-year-old stepdaughter. The trial judge sentenced Hull to the custody of the Mississippi Department of Corrections for twenty years with the last ten years suspended. On appeal to this Court, Hull assigned as error the following issues:

> **I. Whether the Trial Court Erred in Allowing Agent Quill to Testify That Other Scientists Had Verified That His Work Was Properly Done and That the DNA Patterns Matched in Violation of Mississippi Rule of Evidence 802 and the Confrontation Clauses of the United States and Mississippi Constitutions.**

> **II. Whether the Trial Court Erred in Allowing Agent Quill to Testify That a Former Defense Expert Agreed That a DNA Match Existed in Violation of Mississippi Rule of Evidence 403.**

> **III. Whether the Trial Court Erred in Not Granting a Mistrial Based on a Judicial Comment During Voir Dire and Prosecutorial Misconduct During Closing Argument.**

> **IV. Whether the Trial Court Erred in Granting Instruction S-2 and Denying Instruction**

**D-14.**

**V. Whether the Trial Court Erred in Allowing Evidence of a DNA Match Without Statistical Evidence Where Such Evidence Is Irrelevant and Whether the Trial Court Erred in Allowing Testimony That Matches Were Extremely Rare Despite its Prior Ruling That Probability Evidence Was Inadmissible.**

**VI. Whether Hull's Rights to a Speedy Trial under Section 99-17-1 of the Mississippi Code, Federal and State Constitutions Were Violated.**

## FACTS

¶2. Jackie Lee Hull married Gwendolyn Butler, who had a fourteen-year-old daughter by another man. Hull and Butler shared a bedroom in their home in Indianola. Butler's daughter stayed in a bedroom across the hallway. A distance of approximately seven feet separated the two bedroom doors.

¶3. On Saturday, May 5, 1990, Butler and her fourteen-year-old daughter were at home. Hull, who was employed as a truck driver, telephoned Butler at approximately 9:30 p.m to say he was out of state and would not return home until 1:30 a.m. Actually, Hull made this telephone call from Indianola after completing his route. Hull then went to a friend's home where he played cards until 12:15 or 12:30 p.m. Butler and her daughter went to bed after receiving Hull's phone call.

¶4. Sometime between midnight and 1:30 a.m., Butler's daughter awoke to find Hull beside her twin-sized brass bed. Hull told the young woman to be quiet or he would cut her throat. The young girl stated that Hull had an object in his hand, which she later described as a knife. Hull undressed himself and removed the victim's shorts and panties. Hull stated that if the victim could have sex with some other boy, she could also have sex with him. Hull then had sexual intercourse with the victim without her consent. The victim stated she submitted because Hull had told her he would cut her throat.

¶5. At approximately 1:30 a.m., Butler awoke to go to the restroom. She went out in the hallway and saw Hull's keys on a counter and his boots by the door. Hull, in the meantime, donned his clothes while the victim dressed herself. Butler then entered the victim's bedroom and turned on the light. She saw Hull behind the victim's door with a gun in his hand. Butler asked him why he had a pistol in his hand. Hull explained that he had heard a noise and was investigating. Butler testified nothing else seemed awry in the room and that she soon returned to bed.

¶6. The next morning the victim reported to her mother the events of the night before. Butler took her daughter to the police station where they filed a report with Officer Elvis Pernell. The victim was then taken to South Sunflower County Hospital where an examination was performed and rape kit samples were collected.

¶7. The next day, having been informed that the police were seeking him, Hull spoke to his brother-in-law, Roger Mitchell, a Baptist minister. Mitchell testified that Hull confessed that he had sexual relations with the victim.

¶8. Deborah Haller, a forensic scientist at the Mississippi Crime Lab, testified that seminal stains on the victim's shorts came from a B-type secretor. Hull is a B-type secretor.[1] Haller further testified

that seminal stains on the victim's shirt and panties could <u>not</u> have been left by Hull. Haller was unable to determine any ABO grouping (i.e. grouping of blood types A, B, AB, or O) from vaginal and rectal swabs.

¶9. The evidence was then forwarded to the FBI Crime Laboratory for deoxyribonucleic acid (DNA) analysis. Agent Jack Quill testified that using Restriction Fragment Length Polymorphism (RFLP) analysis, the DNA in Hull's known blood sample matched the DNA pattern found in the vaginal swab taken from the victim.

## I.

### Whether the Trial Court Erred in Allowing Agent Quill to Testify That Other Scientists Had Verified That His Work Was Properly Done and That the DNA Patterns Matched in Violation of Mississippi Rule of Evidence 802 and the Confrontation Clauses of the United States and Mississippi Constitutions.

¶10. Hull argues three separate sub-issues dealing with hearsay and the right to confrontation. The first issue deals with the cross-examination of Dr. Lavette, a defense expert, about the writings of a Dr. Sensabaugh, who was not present at trial. The second two sub-issues concern the direct testimony of FBI Agent Jack Quill, who testified his work was reviewed by other FBI agents and a former defense expert who agreed with his results. Each sub-issue is discussed separately below.

### A.

### Dr. Sensabaugh

¶11. Dr. Lavette was a defense expert who testified to the effect that the FBI improperly found a match in the DNA evidence, even using their own protocol. During the State's expert voir dire of Dr. Lavette, the following exchange occurred.

Q. Then, you and a number of other people have published something on Herpes Simple[x] Virus?

A. That's correct.

Q. Is that an article?

A. Yes.

Q. "The Misuse of Genetic Analysis in Forensic Science," published in *The Journal of Forensic Sciences*.

A. Yes.

Q. Was that an article?

A. It was submitted as an article, however, it was published as a letter to the Editor.

Q. And, so it was not peer reviewed, was it?

A. It was very definitely peer reviewed and in fact, a peer review appeared immediately after and in the text of my article. So, not only was it peer reviewed, the peer review was published.

Q. There was a response to your letter to the editor is what it was?

A. No, it wasn't a response. It was a solicited response that is not published one or two issues later. It was published immediately in the text bound. Which is a highly unusual situation I might add in academic publishing.

Q. That was by Dr. Sensabaugh?

A. I believe it was.

Q. He was highly critical of your letter, is that correct?

A. That is correct. I am highly critical of Dr. Sensabaugh also.

Q. Dr. Sensabaugh says Dr. Juricek's letter quote --

BY MR. JONES:

Your Honor, she is quoting hearsay material into the record at this point and this is going far beyond a voir dire of an expert's qualifications as an expert witness and we object on those grounds.

BY THE COURT:

I believe, Counsel, with the curriculum vitae list these as her qualifications and I think Ms. Bridges is questioning what is in the curriculum vitae, is that not correct?

BY MS. BRIDGES:

Yes, sir.

BY THE COURT:

I am going to overrule that objection.

Q. Tell me if this is a correct quotation. "Dr. Juricek's letter to amend application of genetic analysis and forensic science presents a naive and often erroneous characterization of genetic typing analysis in both the research and forensic science context. This is most charitably explained by presuming that Dr. Juricek has no real familiarity with the actual practice of genetic typing. One's charity --

BY MR. JONES:

Your Honor, I hate to interrupt but what she is quoting is a letter written by somebody else. The letter is not listed on this lady's CV. It is bringing an article out of the air, a letter written about something that she has published. I don't think it is even proper cross-examination, much less proper voir dire of an expert witness and we continue to object

BY THE COURT:

Let me ask Dr. Lavette, is this -- I don't have your CV in front of me. I am just assuming that this is something that was listed in your curriculum vitae, right?

A. No, I do not list Dr. Sensabaugh's publications in my CV. Furthermore, this does not even deal with DNA.

BY THE COURT:

I now have what is marked as D-12, the curriculum vitae and listed as Academic Journal Publications #11, list Juricek, D.K. "The Misuse of Genetic Analysis in Forensic Science," *The Journal of Forensic Sciences* 29: 8-12 (1984). Is this the article that she is now asking you about?

A. She is quoting from an article by Dr. Sensabaugh that is written in response to that particular article.

BY THE COURT:

What is listed here as an Academic Journal Publication. So as I understand the voir dire is a question as to whether, in fact, this was an Academic Journal Publication or whether it was published as a letter to the Editor and criticized by --

A. That is correct and I would like to reiterate that it doesn't even deal with DNA.

BY THE COURT:

I think the point has been made that that is not a publication but a letter to the editor as published and that the publisher of the journal took issue with what was contained in the article.

A. That is correct. He also published it.

Q. (Ms. Bridges continuing) Who is Dr. Sensabaugh?

A. Dr. Sensabaugh holds a position at the University of California, Berkeley. I don't know the exact title of his position. He has been for years, perhaps even the 60s, definitely into the 70s and 80s involved in forensic science exclusively, I believe, on the prosecution side. He has been consulted by the FBI on a number of cases and his position is fairly well known within those groups of scientists who call themselves forensic scientists as being very very proforensic science techniques and technology.

Q. What is the NRC?

A. It is National Research Council.

Q. What does it do?

A. The National Research Council was set up by Congress, I believe, to act as an advisory unit

in terms of drafting legislature.

Q. Dr. Sensabaugh is a member of NRC, is he not?

A. That is correct. I might also state that I had communication with the head of the committee at the NRC with regard to Dr. Sensabaugh's being on that committee. I had some concerns in terms of several things. For instance, he testified twice in *California vs. Linda Axel* which was a DNA case that he had no financial compensation from Cellmark Corporation who had done the DNA testing and then was confronted with his contract with Cellmark Corporation indicating that he was getting paid. And, so I forwarded that information on to the NRC. Dr. Sensabaugh and I have been at odds for years as you can guess from this article. We disagree very, very strongly with each other's position. And, as far as I am concerned, that indicates that there is considerable -- it is one indication of many that there is considerable debate in the scientific community about what is being done in forensic science laboratories.

¶12. Hull argues that the use of Dr. Sensabaugh's letter/article was improper voir dire and constituted hearsay evidence which the defendant was unable to cross-examine. In *Lanier v. State*, 533 So. 2d 473 (Miss. 1988), this Court faced a situation in which a lay witness was purportedly cross-examined concerning the extreme mental disturbance of the defendant through the use of a letter which contained a conclusion of medical doctors that the defendant was sane. *Lanier v. State*. The Court stated:

A party does not have the right, under the guise of cross-examination, to introduce evidence that is wholly irrelevant to the issues nor will he be permitted to introduce evidence which under the rules governing admissibility of evidence is incompetent. [Incompetent evidence may not, on cross-examination, be placed before the jury under the guise that it impeaches or discredits the witness,] nor may a witness on cross-examination be asked questions calling for merely hearsay evidence.

81 Am. Jur.2d *Witnesses* 47 at 481 (1976).

One point bears emphasis at the outset. The prosecution did not use the Whitfield report for impeachment. Rather, the effect (and, we presume, the purpose) of the prosecution's use of the report was to place before the jury a substantive conclusion different from that offered by the witnesses. This the prosecuting attorney may attempt to do on cross-examination, provided evidence of the conclusion has already been received or he has a well-founded basis for believing he can establish independently the conclusion with which he confronts the witness, *see Hosford v. State*, 525 So.2d 789, 792 (Miss.1988); *Foster v. State*, 508 So.2d 1111, 1115 (Miss. 1987), and he later offers such evidence.

Impeachment tests the believability of the witness on any subject. The conventional methods for impeaching a witness involve showing the interest or bias of the witness, his character, or prior inconsistent statements. By way of contrast, here the prosecution tried to suggest that others (more competent than the witness) disagreed with the witness' conclusion -- for the purpose of disproving the witness' conclusion. The cross-examination attacked the weight and worth of the witness' testimony. What the prosecuting attorney did comes close to merely arguing with the witness.

*Lanier*, 533 So. 2d at 487; *see also Balfour v. State*, 598 So. 2d 731, 753 (Miss. 1992) (holding that defendant's confrontation clause rights were violated by the prosecutor's "parade" of "testimony" of a silent witness); *Bobb v. Modern Products, Inc.*, 648 F.2d 1051, 1055 (5th Cir.1981) ("cross-examination which attempts to impeach by slipping hearsay evidence into trial shall not be permitted").

¶13. There are several critical distinctions between this case and the above cited cases. First, Sensabaugh's letter did not introduce hearsay evidence that there was a match between Hull's DNA and the DNA found on the victim. His opinion was merely that Dr. Lavette's work was naive and erroneous. Thus, the State did not introduce <u>any</u> evidence which was of value in proving a match did or did not exist, whereas in *Lanier* the prosecutor introduced hearsay evidence that the jury could use substantively to prove the defendant was not suffering from an extreme mental disturbance. Also, while the State did not seek to offer this evidence under another hearsay exception, it might be possible to admit these statements under the learned treatise exception which expressly includes "periodicals." Miss. R. Evid. 803(18). In any event, Dr. Lavette effectively overturned the table set by the prosecutor by serving her own course of hearsay of Dr. Sensabaugh's alleged perjury in a California case.

¶14. This Court finds this line of questioning was not improper.

### B.

### Other FBI agents

¶15. Jack Quill, FBI agent, testified that a match existed between Hull's DNA and the DNA recovered from the seminal fluid found in the victim's vagina. The following colloquy ensued:

Q. We have talked a lot about peer review of articles and things of that nature. Has your work in this particular case been reviewed by other scientists?

A. Yes, It has.

BY MR. JONES:

Your Honor, I object on the grounds of hearsay if she goes any further than that.

BY MS. BRIDGES:

Your Honor, I think it is relevant.

BY THE COURT:

Ladies and gentlemen, I am going to let you step back to your jury room again.

(JURY RETIRED TO JURY ROOM.)

BY MR. JONES:

Your Honor, may I state for the record what the nature of my objection is?

BY THE COURT:

Yes, sir.

BY MR. JONES:

I think that the Assistant District Attorney is getting ready to ask the witness whether other scientists, other people, have looked at his work and whether they criticized him or said anything was wrong with it, whatever, and that is hearsay -- or approved it. That is hearsay evidence. If they want somebody to say I have looked at it and it was okay, bring them into Court.

¶16. The court then allowed a proffer in which it was determined that the State sought to show that various persons had peer reviewed Agent Quill's work and determined that a match existed. Also, the State sought to use the testimony of Dr. Acton, a former defense expert who had testified in a previous hearing of this cause and who agreed with Agent Quill's finding of a visual match. The Court then ruled as follows:

BY THE COURT:

The Court finds that as long as Agent Quill is testifying about what the FBI procedure is and that FBI procedure was followed in his case, that the fact that the case was reviewed by Dr. Harold Deadman and by the Unit Chief, would certainly not be hearsay. He has a right to testify about what the FBI procedure is and how it was followed. The Court also finds that the testimony of Dr. Acton in this Court, while employed by Jackie Lee Hull, concerning the work he had done while in that employment, concerning the review of the FBI's work and, in particular, Agent Quill's work in this case, would be admissible. As to Dr. Tracy, I don't know who Dr. Tracy is or where he comes from.

BY MS. BRIDGES:

He was sitting here at counsel table with us back in March of last year.

BY THE COURT:

That is a long time ago. My mind doesn't go back that far.

BY MR. JONES:

Your Honor, just for the purpose of the record, we respectfully -- if this evidence comes in, we respectfully move for a mistrial at that point and I would just like to have a continuing objection so I don't have to keep standing up and objecting to this line of testimony.

BY THE COURT:

You have a continuing objection. The Motion for a Mistrial will be denied because I think it is proper according to the Rules of Evidence. Let's have the jury.

(JURY RETURNED AND THE FOLLOWING PROCEEDINGS WERE HAD IN THEIR

PRESENCE.)

<u>DIRECT EXAMINATION CONTINUING BY MS. BRIDGES</u>:

BY THE COURT:

You may proceed, Ms. Bridges.

Q. Agent Quill, I believe I had asked you if your work in this particular case, your match in this particular case, had been reviewed by other scientists?

A. Yes, it has.

Q. What is the procedure for reporting out your work, your findings, in your DNA analysis?

A. Upon completion of all my work, it has to be reviewed by another DNA Profiler in the Unit. All of my work, all of my statistical inter- pretations, all of my visual interpretations are reviewed by another. That individual has to sign and date that he reviewed my work and that he agrees and confirms the matches that I had made in -- for example, in this particular case. I put together the package with my dictation. I get the report typed. All of my results and work, notes, then go to the Unit Chief of the DNA Analysis Unit, who then reviews my report once again, looks over my data, and then he will sign off if he feels that everything is right and correct. Then, it is mailed back to the contributor and that is my final work product is my report that goes out and returns to a particular contributor.

Q. Who were the two people -- who were the -- I believe you said the head of the agency--

A. The head of the DNA Analysis Unit is David Bigbee, the Unit Chief of DNA Analysis Unit.

Q. Who is the other scientist who reviewed your work at the FBI Laboratory?

A. Harold Deadman.

Q. What is his title?

A. He is a supervisor, Special Agent, like myself. He also has his Ph.D.

Q. Has your work been reviewed by other scientists?

A. Yes, it has.

Q. This particular case?

A. Yes, it has.

Q. As to the match quality -- excuse me -- as to the factor of the match, who were the other people who have reviewed it?

A. The other people that have reviewed it was a Dr. Acton, Dr. Martin Tracy, and Dr. Lavette.

Q. Who is Dr. Acton?

BY MR. JONES:

Your Honor, I object on the grounds of hearsay unless he can show by personal knowledge.

BY MS. BRIDGES:

He was here, Your Honor.

BY THE COURT:

I think he can probably show by personal knowledge who Dr. Acton is. The objection will be overruled.

A. Dr. Acton is from the University of Alabama and he uses the FBI protocol and procedures in his own testing. He uses the same biological scissors that the FBI uses. He produces pieces of X ray film very similar to what the FBI produces. He reviewed my work and he offered testimony in a prior hearing.

BY MS. BRIDGES:

. . . prior hearing.

BY MR. DYER:

Your Honor, if Ms. Bridges wants to testify, that will be fine. I think he can testify on his own.

BY THE COURT:

Sustained.

A. . . . in a prior hearing here back in March of '91 -- actually, March, '92. It was last year. Almost a year ago. He agreed with my match at that time. His concerns were in the area of the population genetics which are not an issue in this particular case.

Q. Did he agree with the match that you found of the DNA as to the defendant himself?

A. Yes, he did in his review of my pieces of X ray film.

¶17. The defense first argues that Agent Quill's testimony that other FBI personnel reviewed his work and agreed a match existed is hearsay and denied him his right to confront those witnesses against him. Hull agrees that experts are allowed to rely on hearsay evidence as long as it is "relied upon by experts in the particular field in forming opinions." Miss. R. Evid. 703. He notes, however, that Agent Quill did not testify that he regularly relied on these experts nor did he use their knowledge to form his own opinion. Hull relies predominately on ***Kim v. Nazarian***, 576 N.E.2d 427 (Ill. App. 3d 1991), where the court stated:

Rule 703 allows an expert to base his opinion on the opinions of others which are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions. For example, a psychiatric expert may rely on the reports of a patient's psychiatric

history in arriving at his diagnosis. In such circumstances, the opinion of the nontestifying expert would serve simply as a premise supporting the testifying expert's opinion on a broader issue. In the instant case, however, the opinions of the nontestifying experts do not serve as merely a narrow premise upon which the testifying experts' opinions are based. Instead, the nontestifying experts offered corroborating opinions on the same issue as that addressed by the testifying experts.

Accepting for the moment, arguendo, defendants' contention that their experts reasonably relied on their consultation with other experts in forming their opinions, we believe that neither *Wilson* nor Rule 703 allows an expert's testimony to simply parrot the corroborative opinions solicited from nontestifying colleagues.

576 N.E.2d at 433-34.

¶18. We agree with the State that this testimony only related to standard FBI procedures and controls and did not introduce the expert opinions of other personnel. Thus, the statements are not hearsay as they were not offered to prove that a match, in fact, existed, but rather were offered to show whether proper testing procedures were followed.

¶19. This is not to say that such evidence might be used improperly to bolster a witness's testimony by showing that other experts were in complete agreement that the DNA samples matched in a manner which constitutes hearsay and impermissibly bolsters the State's witness. While it would be better to question the expert on the efficacy of the procedures used by a given laboratory prior to the time of his delivering the opinion, in this case the State did not use Quill's testimony as hearsay.

¶20. As to the confrontation clause question, Hull cites *Hall v. State*, 611 So. 2d 915 (Miss. 1992), and *Barnette v. State*, 481 So. 2d 788 Miss. 1985), to argue he was denied his right of confrontation. It is true that *Hall* notes the vital correlation between the rule prohibiting the admission of hearsay evidence and the right of a defendant to confront those witnesses against him. 611 So. 2d 915, 922 (Miss. 1992). However, *Hall* offers no support here. *Hall* was concerned with the right of a defendant to face his accuser. *Id.* In the present case, Hull had the opportunity to cross-examine the victim.

¶21. Hull's other citation, while more analogous, also misses the point. In *Barnette v. State*, this Court reversed, holding a defendant's confrontation clause rights were violated where the analyst who performed certain tests was not available to testify. 481 So. 2d at 791. Here, Hull faced the scientist who actually performed the tests, i.e., Agent Quill.

¶22. Although the State may not impermissibly bolster an expert's conclusion through irrelevant repetitions of corroborative opinions solicited of nontestifying colleagues, the value of face-to-face confrontation in this scenario is low, and this Court declines to create a mechanical confrontation rule in the expert opinion arena. This line of questioning appears to have come closer to the line than was necessary. However, even though it would be preferable to review the methodology of a lab without reference to the testifying expert's conclusions concerning a piece of evidence, the testimony here was adequately linked to the testing methodology of the DNA analysis unit.

**C.**

**Dr. Acton**

¶23. Dr. Acton was a defense expert who withdrew from the defense team when the trial court ordered the release, pursuant to a subpoena, of a DNA database he developed in conjunction with an educational institution in Alabama. Dr. Acton's testimony would have been that a "match" was not an absolute, and that probabilities needed to be assigned to make the significance meaningful. Furthermore, to make the statistical probabilities meaningful, the DNA must be collected from the local geographic area and separated for various demographic features. Dr. Acton would have testified that no such database of DNA samples of the relevant Mississippi population existed. In conclusion, Dr. Acton would have testified that the DNA evidence in this case, even though correctly portrayed as a "match," did not incriminate the defendant in a conclusive manner as the State contended.

¶24. On appeal the defendant argues that State's use of Dr. Acton's testimony was improper on several distinct evidentiary fronts. In the present context, Hull argues that Agent Quill's repetition of Dr. Acton's conclusion was hearsay, not within any exception.

¶25. Under Mississippi Rule of Evidence 801(d)(2)(D), a statement is not hearsay if the statement is offered against a party and is "a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." As to this portion of Hull's argument, we find the statements of a retained expert are admissions pursuant to Rule 801(d)(2)(D).

**II.**

**Whether the Trial Court Erred in Allowing Agent Quill to Testify That a Former Defense Expert Agreed That a DNA Match Existed in Violation of Mississippi Rule of Evidence 403.**

¶26. In his attack on the prosecution's use of Dr. Acton's agreement with the FBI that a visual match existed as to Hull's DNA, Hull relies on Mississippi Rule of Evidence 403. While he admits that in his objection he did not specifically mention Rule 403, Hull states that the ground of his objection is clear when he stated to the trial court:

> Your Honor, the danger with the testimony is the fact that they are going to leave an impression with the jury that we have an expert witness that sides with the other side of the case and that he is out of this case because either we fired him or either we don't want him back in the courtroom. That is just totally devastating to the defendant and it is reversible error as far as I am concerned.

¶27. Hull argues that testimony that Dr. Acton agreed that a match existed implied that the defense fired Dr. Acton because he agreed with the prosecution, thereby inferring that Dr. Lavette was a hired gun. This idea was allegedly planted earlier when the prosecution asked Dr. Lavette the following questions.

> Q. Dr. Lavette, are you aware that Dr. Acton was originally hired as the defense expert in this case?

A. Yes, I am.

Q. Are you aware that he refused to come when the Court ordered him to give up his data?

BY MR. JONES:

Your Honor, may we approach the bench on this?

BY THE COURT:

Yes, sir.

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JURY.)

BY MR. JONES:

Your Honor, she is putting in testimony that is not in the record and implying that we have a witness that we are trying to hide something and I think it is highly improper and possibly grounds for a mistrial.

BY THE COURT:

What is the relevancy of anything dealing with Dr. Acton?

BY MS. BRIDGES:

This is cross-examination, Judge.

BY THE COURT:

Let's limit your cross-examination to something else and move it on and try to get her out of her.

(BACK BEFORE THE JURY.)

BY THE COURT:

Objection will be sustained and the jury will disregard that last comment.

¶28. This last instruction by the trial court to the jury served to limit the danger of unfair prejudice of the testimony regarding Dr. Acton. We hold the trial court did not abuse its discretion in finding, pursuant to the language of Rule 403, that the danger of unfair prejudice of the evidence did not substantially outweigh its probative value.

**III.**

**Whether the Trial Court Erred in Not Granting a Mistrial Based on a Judicial Comment During Voir Dire and Prosecutorial Misconduct During Closing Argument.**

¶29. During voir dire, the trial court stated:

Let me explain that if you listened to the grand jury charge, that a criminal case comes on for hearing by way of an indictment or charge returned by the grand jury. Please understand that the indictment by the grand jury is no indication whatsoever that a person charged with the crime is guilty. You heard me charge the grand jury. <u>You heard me tell them that they would hear only one side of the case; that the State would present its evidence. The defense does not present its evidence. The defendant is not present at the grand jury proceeding. And, anyone who is being investigated by the grand jury testimony would be a very suspect before the grand jury.</u> So, they hear one side of the case and their only job is to determine whether there is sufficient evidence presented in that one side to cause that case to come to trial so that the defendant can have his day in Court. So, you should not consider the fact that this defendant or any other defendant and when I say defendant, I mean the person charged with the crime, is in anywise guilty simply because he has been charged by the grand jury of Sunflower County. The law in the State of Mississippi presumes, and anywhere in this country, that a defendant is innocent at the time the trial begins. That is a principle of law which is dear to this country and which you will apply in this case and every other case. Can each of you tell me that you will presume the defendant to be not guilty as we start this case. Can everybody tell me that?

A. No response.

Q. Can anybody not tell me that?

A. No response.

Q. Let's see your hands if you can tell me if you will presume the defendant to be not guilty as we start this case?

A. Everybody raised their hands.

Q. Let's see your hands if you can't tell me that?

A. No one raised their hands.

(Emphasis added by appellant's brief.)

¶30. After completion of voir dire, but prior to the seating of the jury, the defense stated:

(THE FOLLOWING PROCEEDINGS OCCURRED IN CHAMBERS OUT OF THE PRESENCE OF THE JURY:)

BY MR. DYER:

Your Honor, before we pick the jury, we have a motion to make and before -- it is a Motion for a Mistrial and before I make the Motion for a Mistrial, I would ask that the court reporter read a statement into the record and for the Court to listen what it said earlier and I would like to make my motion respectfully. I have asked the court reporter to get to a specific area and this was in the voir dire --

BY THE COURT REPORTER (Reading from notes):

The State would present their evidence and the defendant would not be present. The defendant is not present at the grand jury proceedings and anyone who is being investigated by the grand jury, their testimony would be a suspect before the grand jury."

BY MR. DYER:

Your Honor, comes now the defendant and moves for a Mistrial and part from this trial would ask that the statement that has just been read into the record be made a part of this particular Motion.

BY THE COURT:

Was that the statement and the charge to the grand jury?

BY MR. DYER:

Yes, sir. I would like to first state to the Court that in the statement you charged the grand jury that the other jurors were present and were in the courtroom at the same time the Court was addressing the grand jury. The statement in and of itself suggesting that a defendant who ended up testifying in front of the grand jury, his testimony would be suspect. The only reasonable inference that I can make from the Court's remarks to the grand jurors and we feel under the circumstances and in light of the fact, the defendant in this case would testify that could very well taint the view points of the potential jurors that we select in this case since they have already heard it said by the Court that any person, in affect, had business before the Court is not worthy to believe or words of that nature.

BY THE COURT:

Anything further?

BY MR. DYER:

No, Your Honor.

BY THE COURT:

First of all, the charge to the grand jury provided for specifically of the Uniform Criminal Rules and the Court read specifically from those rules. That statement has to do with people charged with a crime appearing before the grand jury because defendants do not appear before the grand jury. In this case, there was no suggestion of error at any time during the voir dire so that the Court could explain that comment more fully. The Rule is if there is not a contemporaneous objection to error, then, that error is not preserved. Granted that the charge to the grand jury was prior to the empaneling of this jury. The Court finds that the Motion is not well taken and is, therefore, denied.

BY MR. DYER:

Your Honor, for purposes of the record, would the Court state on the record that this statement was made when the other jurors were present in the courtroom.

BY THE COURT:

For the purpose of the record, the petit jury was still seated in the jury room when the charge to the grand jury was read.

¶31. The defense argues that the trial judge impugned the presumption of innocence in the emphasized portion above. In keeping with the theory that jurors are more apt to be persuaded by comments of the trial judge, the defense asks this Court to hold that these statements constitute reversible error. ***Cone v. State***, 271 So. 2d 453 (Miss. 1973); ***see Collins v. State***, 99 Miss. 47, 54 So. 665 (1911).

¶32. This Court notes that the trial court's statements were not contemporaneously objected to. We find the defendant's failure to object bars a review of this comment. ***King v. State***, 615 So. 2d 1202, 1205 (Miss. 1993).

¶33. During closing, the prosecution argued:

The only person with any motive to lie, ladies and gentlemen, is this defendant. And, he has every reason to lie. And, he has lied to you.

BY MR. DYER:

Object to the defendant had every reason to lie, Your Honor. That is an improper statement for her to make and I object to that and ask the Court to ask the jury to disregard that statement.

BY THE COURT:

Overruled.

MS. BRIDGES (CONTINUING):

He does have every reason to lie, ladies and gentlemen. He is on the line here.

BY MR. DYER:

Your Honor, the record has got my objection, continued objection to this.

BY THE COURT:

All right.

MS. BRIDGES (CONTINUING):

Nobody else has a motive to come in here and endure what has been going on here for four days except this defendant to get out of this. You know, he lied to Gwen when he told her he would not be home that night. He lied to her the next day when he told her he was in Belzoni. And, I remember, ladies and gentlemen, his testimony from yesterday about if he had caught a man in his house, he would have killed him. You may remember that. That is something that you can reflect on. I think he has lied to you, ladies and gentlemen, about what he did.

BY MR. DYER:

Your Honor, I object to the district attorney's statement about what she thinks. It has got to be based on testimony, not what she thinks, Your Honor. -- her opinion.

BY MS. BRIDGES:

I will rephrase it, Your Honor.

BY THE COURT:

All right.

BY MS. BRIDGES:

Do you think he lied to you? That is your decision. Go back in the jury room, ladies and gentlemen, and take a vote. Nowhere in the law does it tell you if he was drunk, it is an excuse. Nowhere in the law does it tell you that this child has got to fight him with every ounce of blood in her body. But, if you believe that she submitted to sexual intercourse with this man, this one right here(points to defendant), because she was afraid, and that he actually had sexual intercourse with her, then, this man is guilty, ladies and gentlemen. He is guilty of rape. I ask you to go vote guilty. I think you know who is telling the truth. I think you know who is telling the truth. Thank you.

BY THE COURT:

Ladies and gentlemen, you have now heard everything there is for you to hear about this case. It is time for you to retire to your jury room to discuss with the end of trying to reach a verdict if you can do so without violence to your individual judgment. You will be given all the Exhibits offered and received. You will be given a yellow pad on which to write your verdict. Should you reach a verdict in this case, write it on that yellow pad and knock on the door and tell the bailiff that you have reached a verdict and we will call for you when we are ready. Mr. Powell and Mrs. Hill, if you will keep your seats and the rest of you may step into the jury room.

(JURY RETIRED TO DELIBERATE A VERDICT.)

BY MR. JONES:

Your Honor, I need to make a Motion on the record.

BY THE COURT:

Just a minute. Let the Court Reporter get the Exhibits all together for the jury.

BY MR. JONES:

Comes now the defendant, Jackie Hull, and moves the Court for a mistrial on the grounds stated during the argument of the Assistant District Attorney, the argument referring to the defendant is one that would have a motive for lying simply because he was the defendant. And, the other statements that she made along those lines that were objected to during the course of

her argument. And, we also renew our previous motions for a mistrial.

BY THE COURT:

The Court notes it sustained the objection to motive for lying and I certainly would not grant a mistrial. Motion is denied.

¶34. Hull argues that it is reversible error for a prosecutor to argue that for the sole reason a person is a defendant, he has a motive to lie. Hull links this argument to the one above arguing the comment strips him of his presumption of innocence. Hull further expresses astonishment that the trial court "notes it sustains the objection to motive for lying" when the record shows the opposite. Hull cites the case of *Sumrall v. State*, 343 So. 2d 481 (Miss. 1977) where this Court stated:

The right accorded an accused to testify in his own defense would be of little value if the trial court itself might blight his testimony by instructing the jury that in deciding upon the credibility of the witness, it should consider the interest the witness has in the outcome of the case, since only the accused has such an interest and such interest is obvious and vital to him and to him alone.

343 So. 2d at 482.

¶35. *Sumrall*, however, is readily distinguishable as it dealt with a jury instruction advising the jury to weigh the motives and interests of the defendant in assessing credibility. A court's instruction to the jury is different from a prosecutor's argument that the defendant has a motive to lie.

¶36. Hull mischaracterizes the State's argument as one in which the State argues that because he is a defendant, he is therefore a liar. Rather, the argument was grounded in the facts admitted and expressly mentioned in the closing argument regarding the fact that Hull lied to his wife about his whereabouts earlier on the evening in question. It is not improper for a prosecutor to comment that the defendant was lying when the contention is supported in the record. *Shell v. State*, 554 So. 2d 887, 899-900 (Miss. 1989); *Simpson v. State*, 497 So. 2d 424, 431-32 (Miss. 1986).

**IV.**

**Whether the Trial Court Erred in Granting Instruction S-2 and Denying Instruction D-14.**

¶37. The Court granted Instructions S-2 and D-9 which read:

INSTRUCTION S-2

The Court instructs the Jury that in a case involving rape, physical force on the part of the assailant, or physical resistance on the part of the victim, is not necessary; that the act is said to be forceful if the proof shows beyond a reasonable doubt that th e female surrendered because of fear arising out of a reasonable apprehension of great bodily harm. If the female fails to resist the attack of her assailant because she is put in such apprehension and fear, the act of the assailant may be rape under the law. If you believe from the evidence in this case beyond a

reasonable doubt that on the date testified about the Defendant, Jackie Lee Hull, did unlawfully, wilfully, feloniously and forcibly have sexual intercourse with Yolanda Butler, a female person over the age of fourteen years, against her will and without her consent, and that Yolanda Butler surrendered to said sexual act because of fear arising out of a reasonable apprehension of great bodily harm then it is your sworn duty to find the Defendant, Jackie Lee Hull, guilty as charged.

## INSTRUCTION NO. D-9

The Court instructs the Jury that if after a consideration of all the evidence in this case you believe, beyond a reasonable doubt, that Jackie Hull had sexual relations with [the victim]; nevertheless, you must still find him not guilty of raping [the victim] unless you also find, beyond a reasonable doubt:

1. That [the victim] did not consent to such sexual intercourse, but that she instead used all reasonable physical resistance available to her under the circumstances then and there existing to prevent the sexual intercourse, or

2. That [the victim] submitted to such sexual intercourse because she reasonably feared that if she did not submit, she would suffer great bodily harm,

If the evidence falls to convince you, beyond a reasonable doubt in this regard, then it is your sworn duty to find the Defendant, Jackie Hull, not guilty.

¶38. The trial court refused instruction D-14, which reads:

## INSTRUCTION D-14

You are instructed that the victim of an alleged rape is under a duty to use all reasonable physical resistance available to her, under the circumstances then and there existing, to prevent the rape unless the proof also shows, beyond a reasonable doubt, that she surrendered because she reasonably feared that if she did not, she would suffer death or great bodily harm. A mere tactical surrender by an alleged rape victim in the face of assumed superior force is not enough. In other words, the complaining witness must resist with all physical resources reasonably available to her under the existing circumstances.

Consequently, you are instructed that even if you find beyond a reasonable doubt that Jackie Hull engaged in sexual intercourse with [the victim] on May 6, 1990, you may still not convict him of rape unless you also find, beyond a reasonable doubt, that such act was done forcefully and against the will of [the victim]. In this regard, if after a consideration of all the evidence in this case, you still have a reasonable doubt as to whether or not [the victim] resisted with all physical resources reasonably available to her under the circumstances, then it is your duty to find the Defendant not guilty.

**Standard of Review**

¶39. This Court's standard in reviewing jury instructions is to read all instructions together and if the

jury is fully and fairly charged by other instructions, the refusal of any similar instruction does not constitute reversible error. *Lee v. State*, 529 So. 2d 181, 183 (Miss. 1988). This Court does not review jury instructions in isolation. *Malone v. State*, 486 So. 2d 360, 365 (Miss. 1986). Refusal of a repetitive instruction is proper. *Allman v. State*, 571 So. 2d 244, 252 (Miss. 1990).

¶40. On appeal, Hull argues that Instruction D-2 took the element of force out of the jury's consideration and that the jury was not properly instructed on the victim's duty to resist.

¶41. As to Instruction S-2, Hull argues that one of the elements of rape is that it is done "without consent and by force," thus instruction S-2 failed to define the necessary elements of rape to the jury. *Hailey v. State*, 537 So. 2d 411, 414 (Miss 1988); Miss. Code Ann § 97-3-65(2) (1972). While this is true, this Court stated in *Stewart v. State*, 466 So. 2d 906 (Miss. 1985):

> The well-settled rule is that in a prosecution for rape, physical force on the part of the assailant or physical resistance on the part of the victim is not necessary if the proof shows beyond a reasonable doubt that the victim surrendered because of fear arising out of a reasonable apprehension of great bodily harm.

466 So. 2d at 909 (Miss. 1985). *See Clemons v. State*, 460 So. 2d 835 (Miss. 1984); *Davis v. State*, 406 So. 2d 795 (Miss. 1981); *Fields v. State*, 293 So. 2d 430 (Miss. 1974). In the present case, the victim stated that the defendant had a dark object in his hand, which she thought was a knife. She testified the defendant told her to be quiet or he would cut her throat. We find that there was no error in granting this instruction as the jury could find the victim acted out of a reasonable apprehension of great bodily harm.

¶42. Hull's support for Instruction D-14 comes from *Christian v. State*, 456 So. 2d 729, 733 (Miss. 1984), in which this Court found such an instruction to be a correct statement of the law. However, *Christian* undercuts Hull's argument in that the Court there held that the trial court properly refused the "tactical surrender" instruction, "because it fails to indicate, as in Davis, that force is not a necessary ingredient of rape if the failure of the victim to resist resulted from reasonable apprehension that she would be greatly injured or killed if she resisted." 456 So. 2d at 733. Thus read, Hull's argument fails under the authority he cites in support of his contention.

¶43. Moreover, the trial court instructed the jury as to the amount of resistance the victim needed to offer if she was not under threat of serious bodily injury. In D-9, the court instructed the jury that the victim must use "all reasonable physical resistance available to her under the circumstances then and there existing to prevent the sexual intercourse." We find that no error occurred in the denial of Instruction D-14.

V.

### Whether the Trial Court Erred in Allowing Evidence of a DNA Match Without Statistical Evidence Where Such Evidence Is Irrelevant and Whether the Trial Court Erred in Allowing Testimony That Matches Were Extremely Rare Despite its Prior Ruling That Probability Evidence Was Inadmissible

¶44. This case presents this Court with its second opportunity to pass upon the propriety of DNA

evidence and its usage in our courts. In ***Polk v. State***, 612 So. 2d 381, 393 (Miss. 1992), this Court held that evidence of a DNA match using Restriction Fragment Length Polymorphism (RFLP) analysis was admissible. 612 So. 2d at 393 (Miss. 1992). In ***Polk***, the trial court refused to admit population statistics, and this Court did not discuss on appeal the admissibility of those statistics because of that ruling. 612 So. 2d at 390. However, the Court did mention, in dicta, that an expert's testimony as to those statistics went to its credibility. *Id.* at 393.

¶45. Polk was tried in 1990. Since then the National Research Council (NRC) has released a report on populations statistics and its use with DNA analysis. The NRC was set up by Congress to act as an advisory unit in terms of drafting legislature.

> [T]he National Research Council (NRC), an organization administered jointly by the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine, appointed a committee to address the issues surrounding forensic DNA testing. In April 1992, the committee released a report entitled "DNA Technology in Forensic Science."

***State v. Vandebogart***, 616 A.2d 483 (N.H. 1992). The report stated as follows:

> Can DNA typing uniquely identify the source of a sample? Because any two human genomes differ at about three million sites, no two persons (barring identical twins) have the same DNA sequence. Unique identification with DNA typing is therefore possible provided that enough sites of variation are examined.

> However, the DNA typing systems used today examine only a few sites of variation and have only limited resolution for measuring the variability at each site. There is a chance that two persons might have DNA patterns (i.e., genetic types) that match at the small number of sites examined. Nonetheless, even with today's technology, which uses 3-5 loci, a match between two DNA patterns can be considered strong evidence that the two samples came from the same source.

> Interpreting a DNA typing analysis requires a valid scientific method for estimating the probability that a random person might by chance have matched the forensic sample at the sites of DNA variation examined. A judge or jury might appropriately weigh the significance of a DNA match between a defendant and a forensic sample if told, for example, that the pattern in the forensic sample occurred with the probability that it's not known exactly what is less than one in a thousand. <u>Saying that two patterns match without providing any scientific data test in at least an upper bound of frequency with which the match might occur by chance is meaningless</u>.

> Substantial controversy has arisen concerning the methods for estimating the population frequency of specific DNA typing patterns. . . .

616 A.2d at 493 (emphasis added).

¶46. In the present case, the trial judge ruled exactly the same way, holding that evidence of a match was admissible, but evidence of population statistics was not. During trial in the course of examining FBI Agent Quill, the following evidence came before the jury.

Q. I want to ask you if you agree with some other statements out of this publication.

A. Sir, which publication is that?

Q. The NRC Report.

A. Okay.

Q. This is under Paragraph 1.4, Page 110 of this report.

A. Okay.

Q. The title of that paragraph is <u>Population Genetics Relevant to the Interpretation of DNA Typing</u>.

A. I would have to see what you are going to be referring to.

BY THE COURT:

Agent Quill-- (hands report to witness).

A. Could you repeat that for me. I believe it was 1-10 wasn't it?

Q. Correct.

A. This is the pre-published --

Q. . . . pre-publication --

BY MS. BRIDGES:

Your Honor, may we approach the bench?

BY THE COURT:

Yes.

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JURY.)

BY MS. BRIDGES:

I believe this has to do with statistics which I believe the Court has ruled that we are not going to get into. This is Page 110, Paragraph 1.4.

BY THE COURT:

I don't know if he is qualified to give opinions because we are not dealing in statistics.

BY MR. JONES:

I was just going to ask him if he agreed or disagreed with the statement, Your Honor.

BY MS. BRIDGES:

To which we object, Your Honor. We have been prevented from bringing in our expert on statistics and I think that is what this is dealing with and we object to it. Population genetics. I had a population geneticist prepared to testify and the Court prohibited us from bringing that expert in.

BY THE COURT:

I am going to overrule the objection and allow you to ask the question.

(BACK BEFORE THE JURY.)

Q. Agent Quill, look down three lines in that paragraph 1.4 and I just want to ask you if you agree or disagree with this sentence? "If two samples are indistinguishable with regard to the detected DNA patterns, two possibilities exist, the two samples came from the same person or from identical twins, or the two samples came from different persons whose DNA patterns in the target region investigated are the same." Do you agree with that or not?

A. Yes, I do.

. . . .

Q. Would you agree with this statement. To say that two patterns match without providing any estimate of the frequencies of the matches is just meaningless?

A. No, I don't agree with that statement.

Q. Do you realize that statement is on Page 3-1 of the NRC Report?

A. Well, I believe that a person can interpret results without a statistical assessment which means -- you are referring to an issue of population genetics. But, to answer your question, that is where one would want to give a probability statement. One can offer an opinion as to a match or no match without a probability statement.

Q. So, you say where this report says to say there is a match without anything else, that is not right?

A. My opinion is that a person can give an opinion of a match without a statistic.

Q. This report says, to say there is a match is meaningless. You just say that is not right?

A. No, I am saying it is visual and it is numerical. It just depends if a person wants to offer an opinion to a match, a person can certainly do so.

Q. I will ask one or two more questions. My question to you is does the report say it is meaningless?

A. If you can show me -- there are many things in the report -- if you want to do a direct quote, that will be fine. I don't recall off-hand if it says that specifically.

Q. I just did a direct quote.

BY THE COURT:

You have the report available if you will refer him to the page. It is 3-1.

BY MR. JONES:

May I approach the witness, Your Honor.

BY THE COURT:

Yes.

Q. This paragraph right here. Does the report say that?

A. Yes, it does.

BY MR. JONES:

I tender the witness.

BY THE COURT:

Re-direct examination.

REDIRECT EXAMINATION BY MS. BRIDGES:

Q. Agent Quill, did you compute the statistical probabilities for this case?

A. Yes, I did.

Q. Have you been allowed to testify to that?

A. I have not.

BY MR. DYER:

Your Honor, we object to that. That is the Court's ruling.

BY MS. BRIDGES:

That's right, Your Honor, and they brought it up.

BY THE COURT:

Counsel approach the bench.

(COUNSEL APPROACHED THE BENCH OUT OF THE HEARING OF THE JURY.)

BY MS. BRIDGES:

Your Honor --

BY MR. DYER:

Your Honor, this is a ruling of the Court and we abided by the Court's ruling. This is what was simply asked the Agent in the report does it state that a question of a match whether or not --

BY THE COURT:

This causes me great concern because he is not giving any statistical data that everything he has said here is meaningless. I think the Court's ruling is that it is not meaningless. The Court is bound by the Supreme Court Decision and I will allow her to ask if he has done a statistical computation and he could give it but he is not being asked to give it. I think that is more reasonable. I am going to overrule the objection.

BY MR. DYER:

Your Honor --

BY THE COURT:

I am not going to allow him to give it.

BY MR. DYER:

Let me see if I understand. The Court will allow Ms. Bridges to ask the question if he has statistical data but he is not allowed because of the Court's ruling to give it.

BY THE COURT:

Yes.

BY MS. BRIDGES:

How are we going to clear this up, Your Honor?

BY THE COURT:

I am going to allow him to answer your question but not allow him to give the statistical facts.

(BACK BEFORE THE JURY.)

BY THE COURT:

Go ahead, Ms. Bridges.

Q. Agent Quill, did you compute the statistical probabilities of a source of a seminal fluid being the defendant.

A. Yes, I did.

Q. Are you being allowed to testify to that?

A. No, I am not.

Q. Are you aware of any other experts which the State had engaged to testify about their computations of statistical probabilities?

BY MR. DYER:

Objection, Your Honor. The same objection which was made before. This has gone way past the original question.

BY THE COURT:

Ladies and gentlemen, I think the instruction to you at this point from the Court is necessary and regardless of what the National Research Council prepublication copy of DNA Technology in Forensic Science says, this Court has ruled that the Mississippi Supreme Court in a recent case called *Polk vs. State* has set forth guidelines for the introduction of DNA testimony in this state which guidelines do not include any ability to discuss population genetics. Therefore, this Court is prohibiting in this case any testimony concerning population genetics or probabilities.

BY MS. BRIDGES:

Thank you, Your Honor.

. . . .

Q. Counsel asked you a question in the NRC Report on Page 1-10. You still got it.

A. Yes I do.

Q. He asked you if you agreed to that?

A. Yes.

Q. Can you explain this to the jury?

A. At this point, in the report--

BY THE COURT:

Excuse me, Agent Quill, for the sake of the jury it might be nice to read that quote again. There have been a lot of quotes to the jury.

Q. There have been and I apologize, Your Honor. Would you like to read it?

A. If you can refresh my memory as to which one.

Q. It is on population genetics relevant to the interpretation of the DNA typing. I believe it is the second sentence of paragraph 1.4.

BY THE COURT:

I think the line starts "however" --

A. (*Reading*) However, if two samples are indistinguishable with regard to the detected DNA pattern, two possibilities exist. The two samples came from the same person (or from identical twins) or the two samples came from different persons whose DNA pattern in the target regions investigated are the same.

Q. Do you agree with this. Can you explain this to us?

A. Yes, that is why there can be other people having DNA profiles like yours at a specific location. That is why you do four probing for four different chromosomes so that at four different sites that you are looking at. That is why you do four different ones so you can see that people are different and you are able to account for any similarities. At this point, with the technology until one would have to continue to probe and probe and then it is based on statistical calculations. What is the chance at random of another individual in the population having a profile like a person. So, based on that, they are saying from the visual you either have the same person, identical twins or you have someone who has the exact same DNA profile as myself - for example - some other person. The way to account for this is to -- studies have been done and I will refer back to the paper of Neil Risch and Bernie Delvin from science, February, 1992, where they have looked at the FBI database, Lifecodes' database and looked at all the databases and found the chance to be extremely rare of finding two people having the exact same two random individuals having the same DNA profile. This deals with statistics.

BY MR. JONES:

Object at this point. He is talking about probabilities.

BY MS. BRIDGES:

Counsel brought it up when he quoted it, Your Honor.

BY THE COURT:

I am going to overrule the objection at this point but I don't think he needs to go any further than he has already gone.

¶47. Hull, on appeal, makes a two-fold argument.

¶48. First, Hull argues the trial court erred in admitting evidence of a match where such evidence is meaningless. Hull argues that such evidence is irrelevant under Mississippi Rule of Evidence 401 and is not helpful to the trier of fact under Rule 703. The State replies that this question has been answered by ***Polk v. State***. Indeed, this appears to be the same argument that was raised in ***Polk***. This Court holds that the evidence of a match was relevant for these purposes.

¶49. Hull next argues that when the trial court refused to allow population statistics, the evidence of a match became substantially more prejudicial than probative. The unfair prejudice, Hull argues, is that the FBI may argue that a match is "extremely rare," in the words of Agent Quill above, or, as the

prosecutor argued in closing, that "an innocent suspect has nothing to fear from DNA except an equal twin. . . ." This type of testimony, Hull argues, leaves the jury with the impression that a match is conclusive. This Court in **Polk** used the words "bordering on the absolute." 612 So. 2d at 388 n.1

¶50. Hull cites several cases, decided since the publication of the NRC report that have held that DNA evidence should not be admitted at all unless reasonable probability estimates are also admitted. **New Hampshire v. Vandebogart**, 616 A. 2d 483, 494 (N.H. 1992); **State v. Cauthron**, 846 P. 2d 502, 516 (Wash. 1993); **Commonwealth v. Lanigan**, 596 N.E.2d 311, 314 (Mass. 1992); **People v. Barney**, 10 Cal. Rptr. 2d 731, 745 (Cal. App. 4th 1992) (abrogated by **People v. Wilds**, 37 Cal. Rptr. 351 (Cal. App. 4th 1995)).

¶51. Helpful to this Court is the consideration of this issue by the Wyoming Supreme Court, which allowed the introduction of DNA matches without accompanying statistical evidence. **See Rivera v. State**, 840 P. 2d 933 (Wyo. 1992). After being presented with the issue *sub judice*, however, the Court Wyoming reconsidered and stated:

> If we are to follow our previous applications of **Stephens** in **Rivera** then Agent Lynch's testimony would be permitted only to the point that she declared a match of the DNA samples. It would then be up to the jury to interpret the significance of this broad general statement. Does a match mean that this defendant is the perpetrator? Could anyone else have possibly contributed the sample. We must conclude, as did the Iowa court in **Brown**, that "the ultimate results of DNA testing would become a matter of speculation" without statistical evidence. **Brown**, 470 N.W. 2d at 33; *see also Vandebogart*, 616 A. 2d at 494 (finding that a "match is virtually meaningless without a statistical probability expressing the frequency with which a match would occur." We agree that:

> [t]he statistical calculation step is the pivotal element of DNA analysis, for the evidence means nothing without a determination of the statistical significance of a match of DNA patterns. **Barney**, 10 Cal. Rptr. at 742.

**Springfield v. State**, 860 P. 2d 435, 448 (Wyo. 1994).

¶52. The parties in the instant case are in agreement that statistical evidence is analytically relevant. The trial court appears from the record to have been very hesitant in allowing this evidence in the absence of guidelines from this Court. Therefore, we now address this issue.

¶53. This Court reasons that if the witnesses can put the meaningfulness of a match in terms of strong or weak, then it is unreasonable to prevent the parties from putting on statistical evidence to show how strong or how weak the evidence is. Without this evidence, the ability of the jury to use this evidence may be diminished to such a degree as to be unhelpful to the trier of fact under Rule 703, or more prejudicial in that a jury may think it needs no evidence other than the "conclusion" that the defendant's DNA was found upon the victim's person. Accordingly, we hold that where the trial court finds that evidence of a DNA match is admissible as relevant, the court should also allow scientific statistical evidence which shows the frequency with which the match might occur in the given population. However, in light of the overwhelming evidence of guilt in the case *sub judice,* including the eyewitness account by the victim and the corroborating admission of Hull as told by Roger Mitchell, the failure of the trial court to admit such evidence did not so prejudice Hull's defense as to

constitute reversible error.

## VI.

**Whether Hull's Rights to a Speedy Trial under Section 99-17-1 of the Mississippi Code, Federal and State Constitutions Were Violated.**

¶54. Hull was arrested on May 7, 1990. One hundred eighty-two days passed until his arraignment on November 30, 1990. Over two years passed until the time of Hull's trial on February 1, 1993. The trial court found the following:

> In addition to those dates set forth in Exhibit D-5, the Court thinks there's some additional dates that need to reflect in this record, based on the file in this case. On February the 6th, 1991, the Court had to rule on a defense motion seeking to obtain certain records -- medical records of the victim in this cause. The case was set for trial on February the 21st, and the State's motion for continuance was filed February the 13th of 1991, and there may be some overlapping here. The reason given for that continuance was because of the blood work being in progress, that being the same day the State filed it's motion for taking blood and saliva samples. The Court found that that was good cause for continuance as it would have made it virtually impossible to try Jackie Hull for this crime on February the 21st, even had there not been another case that was tried, being the Charles Thomas case, and the Court will take judicial knowledge of the fact that that case took approximately one full week, going into Saturday. On February the 25th, 1991, the Defendant filed a motion for additional discovery. On May 23rd the State requested a continuance because the work done by the State Crime Lab was inconclusive, and the State wished to have DNA testing done by the FBI. The order dated May the 27th found that the samples had been sent to the Crime Lab at Quantico, Virginia, pursuant to the State Crime Lab's request, but would not be completed by the September, 1991, Term, and found good cause for continuance. The Court also in that order acknowledged that that delay could prove exculpatory to the Defendant, depending on the results of the DNA testing. After the DNA testings were furnished to the Defendant on or about July 25th, the Defendant made a motion for additional discovery on August the 2nd. There was a hearing on that motion, and the motion was denied on August the 22nd. On that date there was also a motion for additional discovery made by the Defendant. On September the 3rd, 1991, the Defendant filed several other motions, including a motion to extend the deadline for motions. On September the 9th of 1991, the Defendant filed additional motions, and the affidavit of the Defendant's attorney attached to one of those motions states in part that the investigation is still ongoing and that he had names of additional witnesses which had not been furnished to the State, but would be furnished on request. Then, on September the 27th, 1991, the Defendant filed a motion for continuance from the October 8th setting, because his expert had not had time to investigate and prepare and requested a setting in the February, 1992, term. On January the 6th of 1992, the Defendant filed another motion for additional discovery. The critical date at this juncture is November the 30th, 1990, the date the Defendant was arraigned, and also the date of September the 27th of 1991, being the date of the Defendant's filing of motion for continuance to the February term. Based on the Defendant's calculations in Exhibit D-5, that is three hundred and one days, one hundred and twenty of which were days in which the FBI was analyzing the samples furnished to them.

The State of Mississippi has no control over the FBI and could not speed up that testing that the Court determined could have been exculpatory. Deducting a hundred and twenty days from the three hundred and one days, that's a period of one hundred and eighty-one days. Likewise, during that time there were defense motions filed which had to be disposed of, accounting for additional delays which should be charged to the Defendant. The Court finds that any delays chargeable to the State were reasonable and necessary and good cause shown therefor. Therefore, the Court overrules the motion to dismiss for lack of prosecution within the two hundred and seventy day period.

¶55. This Court has held that post-delay determinations of cause are permissible and, when supported by substantial credible evidence, shall not be overturned. *McNeal v. State*, 617 So. 2d 999, 1007 (Miss. 1993); *Folk v. State*, 576 So. 2d 1243, 1247 (Miss. 1991); *McGee v. State*, 608 So. 2d 1129, 1132 (Miss. 1992). As to one of Hull's main complaints, that the State's investigation was improperly handled, the trial court found there to be good cause shown. The other complaint is that when the trial court issued a *subpoena duces tecum* against Dr. Acton, the delay in finding and preparing new experts should be chargeable to the State because the subpoena was improperly issued. Hull does not, on appeal, raise the subpoena issue independently of the 270-day motion. Thus, we find that the ruling of the trial court was based on substantial credible evidence and this issue is without merit.

### Constitutional Right to a Speedy Trial

¶56. The defendant also raises his right to a speedy trial. Below the court ruled as follows:

All right. The Court did previously rule on January the 10th that delays were shown for good cause -- were for good cause shown, and there was a potential exculpatory evidence to be gained by some of the delays. I think the Court should note that in the *Barker v. Wingo* case, the delay in that case was five years, and the Supreme Court found that that was not a denial of due process rights to a speedy trial, that there's no inflexible testing making that determination, and, of course, the Federal Courts are now under a seventy-day limitation similar to our two hundred and seventy day rule. But the Supreme Court in *Henderson v. U.S.*, at 476 U.S. 321, 106 S. Ct. 1871, 90 L.Ed.2d 199, a 1986 case, stated all time between the filing of pretrial motions and the end of hearing of those motions, whether the delay was reasonably necessary or not is excluded from that seventy-day limitation. And I think that we are still dealing with pretrial motions in this case, and because the U.S. Supreme Court has made that statement concerning the speedy trial act, that certainly the same should be considered as part of the test in determining the constitutional provisions of a speedy trial. The Court finds that that motion is not well taken and will be denied.

¶57. Hull asserts that he was denied his constitutional right to a speedy trial where during the delay from the time of his arrest on May 7, 1990, until the time of his trial on February 1, 1993, some 1,062 days (almost three years) passed. The delay being over eight months, the burden shifts to the State to show the defendant has not been denied his right to a speedy trial. *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989). This Court analyzes this issue under the four *Barker v. Wingo*, 407 U.S. 514 (1972), factors as discussed below.

¶58. *Length of Delay*. One thousand sixty-two days passed in bringing the case to trial. This is a presumptively prejudicial delay, which gives Hull's position some credence.

*¶59. Reason for the delay.* Some of this period is attributed to the time it took the FBI laboratory to prepare potentially exculpatory DNA evidence. Other periods were spent in hearing and ruling on pre-trial motions of the defense. This factor would seem to weigh very slightly, if at all, in favor of Hull.

*¶60. Defendant's Assertion of His Right.* The defendant did not request a speedy trial, but only moved to dismiss for a denial of a right to a speedy trial This factor thus weighs against the defendant. ***Perry v. State***, 637 So. 2d 871, 875 (Miss. 1994); ***Adams v. State***, 583 So. 2d 165, 169-70 (Miss. 1991).

*¶61. Prejudice to the Defendant.* While undoubtedly there is some anxiety and concern of the accused, there is no other prejudice of which Hull complains on appeal. Thus, this factor has little weight in favor of the defense.

¶62. Viewing our case law concerning the right to a speedy trial, this case fits somewhere between ***Taylor v. State***, 672 So. 2d 1246 (Miss. 1996), and ***Jenkins v. State***, 607 So. 2d 1137 (Miss. 1992). ***Taylor*** involved a defendant tried approximately 1,027 days following his arrest. 672 So. 2d at 1258. Taylor was incarcerated while awaiting trial having had his parole revoked. This Court found Taylor was not denied his right to a speedy trial. *Id.* at 1262.

¶63. On the other hand, in ***Jenkins***, the defendant suffered a two and one-half year delay in the trial of his case. 607 So. 2d at 1139. Jenkins suffered actual prejudice by the intervening death of the only witness alleged to have tied defendant to the robbery. *Id.* at 1140.

¶64. We find that in light of these cases and of the four ***Barker*** factors discussed above, Hull was not denied his right to a speedy trial.

## CONCLUSION

¶65. Upon close examination of the issues presented in this case, we find merit only in the contention that when the trial court admitted evidence of a DNA match, the court should also have admitted statistical evidence of the frequency of such. However, in light of the overwhelming evidence of guilt in this case, we find the resulting prejudice to Hull's defense to be insufficient to reverse on this issue. Finding such error to be only harmless, we affirm.

¶66. **CONVICTION OF CAPITAL RAPE AND SENTENCE OF TWENTY YEARS, WITH THE LAST TEN YEARS SUSPENDED WITH CONDITIONS, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND PAYMENT OF ALL FEES AND COSTS AFFIRMED.**

**PRATHER, P.J., PITTMAN, ROBERTS AND SMITH, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. SULLIVAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, J; BANKS, J., JOINS EXCEPT FOR PART VI. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND BANKS, J.**

**SULLIVAN, PRESIDING JUSTICE, DISSENTING:**

¶67. I agree with the majority's finding regarding error number four that no error occurred in the denial of Instruction D-14. However, I disagree with their conclusions regarding errors number one, two, three, five and six. Therefore, I must respectfully dissent.

## I.

## Whether the Trial Court Erred in Allowing Agent Quill to Testify That Other Scientists Had Verified That His Work Was Properly Done and That the DNA Patterns Matched in Violation of Mississippi Rule of Evidence 802 and the Confrontation Clauses of the United States and Mississippi Constitutions.

## A.

## Dr. Sensabaugh

¶68. The first piece of the testimony that Hull correctly argues was inadmissable hearsay was an excerpt of a published letter written by Dr. Sensabaugh. Dr. Sensabaugh wrote the letter in response to a published letter by Dr. Lavette, an expert witness for Hull. Dr. Sensabaugh's letter characterized Dr. Lavette's opinions on genetic typing analysis as naive and erroneous. Clearly this is hearsay, as Dr. Sensabaugh's statement is offered to prove the truth of its assertion that Dr. Lavette's work is naive and erroneous. As Hull points out in his brief, the argument that the excerpt was used for impeachment supports the fact that the statement must have been offered to prove the truth of the matter asserted; otherwise, it would have no impeachment value. The statement does not fall within any of the hearsay exceptions set out in the Mississippi Rules of Evidence. Contrary to the majority's finding, the testimony was not admissible under the learned treatise exception, because the proper foundation was not laid to establish the reliability of the treatise, as is required by Rule 803(18).

¶69. Furthermore, Dr. Sensabaugh's letter was not proper impeachment testimony. It strays from the traditional impeachment methods showing interest, bias, character, or prior inconsistent statements. *Lanier v. State*, 533 So.2d 473, 487-88 (Miss. 1988). As in *Lanier*, this line of questioning was not used for impeachment, but to "suggest that others (more competent than the witness) disagreed with the witness' conclusion--for the purpose of disproving the witness' conclusion." *Id* at 488. Instead of properly impeaching Dr. Lavette by testing her believability, this line of questioning "attacked the weight and worth of the witness' testimony" and was used for "merely arguing with the witness." *Id*. This Court has previously held that incompetent hearsay evidence may not be presented to the jury under the guise of impeaching the witness. *Id* at 487. The majority finds that this case is distinguishable from *Lanier*, because Dr. Sensabaugh's letter had no value in proving whether or not Hull's DNA and the DNA found on the victim matched. However, this distinction does not lessen the impact of *Lanier* in barring introduction of inadmissable, incompetent hearsay masquerading as impeachment testimony. *Id*. Dr. Sensabaugh's letter constituted inadmissable hearsay, and the trial court erred in allowing the prosecutor's line of questioning on the matter.

## B.

## Other FBI Agents

¶70. Hull next effectively argues the inadmissability of testimony by Agent Quill of statements by other scientists verifying his work and conclusion that the DNA patterns matched. Agent Quill testified that three doctors had reviewed his work and agreed with his conclusion that Hull's DNA and the DNA found on the victim matched. This Court has previously held that hearsay testimony may not be used to bolster a witness's in-court testimony. *Jackson v. State*, 423 So.2d 129, 130 (Miss. 1982). *See also Henry v. State*, 209 So.2d 614, 617 (Miss. 1968). The majority maintains that these doctors' statements were not offered as hearsay, to prove the truth of the matter asserted, but were instead used to show that Agent Quill properly followed standard FBI procedures and controls. However, Agent Quill's testimony regarding the corroborative statements of other doctors is clearly inadmissable hearsay used to bolster Quill's conclusion that a DNA match existed. Admission of these hearsay statements was error on the part of the trial court.

## C.

### Dr. Acton

¶71. The third piece of testimony which Hull correctly categorizes as inadmissable hearsay is Quill's statements about Dr. Acton agreeing that a DNA match existed. The majority concludes that these statements are not hearsay, because having been a defense expert prior to his withdrawal, Dr. Acton was an agent of Hull, thereby making his statements an admission and excluded from the definition of hearsay. This conclusion is erroneous, because it is contrary to the traditional view of the difference between an agent and an independent contractor. This Court has previously held that in determining whether an individual acts as an agent or an independent contractor hinges on the question of control. *Fruchter v. Lynch Oil Company*, 522 So.2d 195, 199 (Miss. 1988). Since there is no proof that Dr. Acton was under Hull's control, Dr. Acton could not have acted as an agent of Hull, and therefore Dr. Acton's statements are not attributable to Hull as an admission. The statements were inadmissable hearsay, and the trial court erred in overruling Hull's objection to their admission.

### Violation of the Confrontation Clause

¶72. In addition to violating the Mississippi Rules of Evidence, admission of these hearsay statements also violated the confrontation clauses of the United States and Mississippi Constitutions. The confrontation clause acts to preserve the right of a criminal defendant to confront witnesses against him. U.S. Const. amend. VI; Miss. Const. art. 3, § 26. By its very definition, hearsay evidence prevents the exercise of this right.

> These confrontations clauses 'are in a sense hearsay rules elevated to constitutional status' designed to prevent the admission of non-confronted out-of-court statements which lack reliability, are not made under oath, and deny the accused defendant the opportunity to cross-examine such a statement so as to test its truthfulness and reliability.

*Williamson v. State*, 512 So.2d 868, 873 (Miss. 1987) (quoting *Mitchell v. State*, 495 So.2d 5, 8 (Miss. 1986). Additionally, "the confrontation clause acts so as to even restrict proof which under our evidence rules would be classified as 'admissible hearsay.'" *Lanier*, 533 So.2d at 488 (citation omitted). Hull was given no opportunity to cross-examine the declarants of these hearsay statements, thus violating the confrontation clause. "Few doubt that the essence of confrontation is the right to cross-examine, that the best test of the truth of testimony is that it be cured in the crucible of cross-

examination." ***Williams v. State***, 595 So.2d 1299, 1307 (Miss. 1990) (citing ***Hall v. State***, 539 So.2d 1338, 1346 (Miss.1989); ***Prewitt v. State***, 126 So. 824, 825 (Miss. 1930)). Clearly, then, in this case the trial court's error in allowing inadmissible hearsay statements prevented Hull from exercising his constitutional right to confront these witnesses against him.

## II.

### Whether the Trial Court Erred in Allowing Agent Quill to Testify That a Former Defense Expert Agreed That a DNA Match Existed in Violation of Mississippi Rule of Evidence 403.

¶73. In addition to being inadmissible hearsay, evidence of Dr. Acton's statements should also have been excluded pursuant to Mississippi Rule of Evidence 403. Rule 403 allows relevant evidence to be excluded if its prejudicial effect substantially outweighs its probative value.

> [A] trial court presented with a Rule 403 objection to relevant evidence must engage in a balancing process. The more probative the evidence is, the less likely it is that a 403 factor will be of sufficient consequence to *substantially* outweigh the probative value. On the other hand, the less probative value the evidence has, the less significant the 403 factor would have to be to justify exclusion.

***Foster v. State***, 508 So.2d 1111, 1117 (Miss. 1987). During cross-examination, the prosecution questioned defense expert Dr. Lavette about the circumstances of Dr. Acton's resigning as the defense expert. The combined effect of Dr. Lavette's testimony elicited by the prosecution and Agent Quill's testimony that Dr. Acton agreed with his findings was to leave the jury with the impression that the defense had discarded Dr. Acton and replaced him with Dr. Lavette, a "hired gun." Such improper testimony had the prejudicial effect of groundlessly bringing Dr. Lavette's credibility into question and creating the impression that the defense was trying to conceal evidence. Evidence of Dr. Acton's agreement with Agent Quill's finding of a DNA match was merely cumulative. Therefore its prejudicial effect against Hull substantially outweighed any probative value, and it was error not to exclude it.

## III.

### Whether the Trial Court Erred in Not Granting a Mistrial Based on a Judicial Comment During Voir Dire and Prosecutorial Misconduct During Closing Argument.

¶74. In addressing the jury before voir dire, the trial court stated, "The defendant is not present at the grand jury proceedings and anyone who is being investigated by the grand jury, their testimony would be a suspect before the grand jury." Hull correctly argues that this statement incorrectly informed the jury that the testimony of any defendant appearing before a grand jury would automatically be suspect. Such erroneous jury instruction had the effect of casting a shadow upon the defendant's presumption of innocence.

¶75. The prosecution's comments characterizing Hull as a liar further denigrated Hull's presumption of innocence. The prosecution argued, "The only person with any motive to lie, ladies and gentlemen, is this defendant. And, he has every reason to lie. And, he has lied to you. . .He does have every reason to lie, ladies and gentlemen. He is on the line here." This line of argument continued over

objection by Hull and had the effect of erroneously instructing the jury that as a criminal defendant, Hull should be presumed a liar. Hull correctly asserts that these comments constituted prosecutorial misconduct which removed his presumption of innocence and should not have been allowed.

> The principle that there is a presumption of innocence in favor of the accused in a criminal prosecution is 'fundamental.' Its enforcement lies at the foundation of the administration of our criminal justice system. Though not expressly written into the Bill of Rights, the presumption of innocence has long been recognized as the logical corollary of the principle that the prosecution bears the burden of proof beyond a reasonable doubt, a proposition which has been accorded federal constitutional status. This Court has been sensitive to subtle erosions of the presumption of innocence.

*Hickson v. State*, 472 So. 2d 379, 383 (Miss. 1985) (citations omitted). This Court has previously held that tainting the presumption of innocence constitutes fatal error. *See Cone v. State*, 271 So.2d 453 (Miss. 1973). The combined statements of the trial court and the prosecutor worked to erode Hull's presumption of innocence, resulting in fatal error.

## V.

**Whether the Trial Court Erred in Allowing Evidence of a DNA Match Without Statistical Evidence Where Such Evidence Is Irrelevant and Whether the Trial Court Erred in Allowing Testimony That Matches Were Extremely Rare Despite its Prior Ruling That Probability Evidence Was Inadmissible.**

¶76. I agree with the majority's conclusion that admitting evidence of a DNA match without allowing statistical evidence to explain its meaning to the jury renders such DNA evidence nearly useless or even unfairly prejudicial. It was therefore error on the part of the trial court in this case to admit evidence of a DNA match between Hull's DNA and DNA found on the victim, without also admitting statistical evidence to explain the strength or weakness of that evidence. However, I disagree with the majority's flippant conclusion that the error was not prejudicial because of the overwhelming evidence of guilt. Evidence of the DNA match was key to the prosecution's case. The opportunity to attack the DNA evidence through the testimony of its own experts on statistics would have significantly aided the defense. Therefore, to say that error in the court's decisions regarding the admissibility of evidence related to DNA analysis was not prejudicial to Hull's case is illogical. Furthermore justice is impugned by implying that evidence of a defendant's guilt negates the need to protect his right to a fair trial. Even guilty defendants have rights which should be fervently protected by this Court.

## VI.

**Whether Hull's Rights to a Speedy Trial under Section 99-17-1 of the Mississippi Code, Federal and State Constitutions Were Violated.**

### A.

### Section 99-17-1

¶77. Miss. Code Ann. § 99-17-1 states, "Unless good cause be shown, and a continuance duly

granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned." Hull was arraigned on November 30, 1990. His trial began on February 1, 1993. 792 days passed between the time of Hull's arraignment and the time of his trial, well exceeding the 270 day limit. As this Court pointed out in *Vickery v. State*, 535 So.2d 1371, 1375-76 (Miss. 1988), delay caused by continuances granted to the defendant should be subtracted from the time between arraignment and trial. As discussed below, 369 days of the delay are attributable to the defense for continuances. That leaves 423 days of delay attributable to the State. Of that time period, the State only accounts for 120 days, which the trial court found was necessary for analyzation of samples by the FBI crime lab. However, as Hull points out, the State gives no explanation for its delay in conducting those investigations, which could have begun even before Hull's indictment. Regardless, even if those 120 days were reasonable continuances for investigatory purposes, there are still 303 days between Hull's arraignment and trial which are unaccounted for by the State. Over 270 days elapsed between Hull's arraignment and trial without sufficient showing of good cause. As a result, Hull's right to a speedy trial was violated pursuant to Miss. Code Ann. § 99-17-1.

## B.

## Constitutional Right to a Speedy Trial

¶78. As a result of the near three-year delay between the time of his arrest and the time of his trial, Hull was denied his constitutional right to a speedy trial. The majority is correct in applying the four factors below set out in *Barker v. Wingo*, 407 U.S. 514 (1972), to analyze the speedy trial issue. However, I disagree with the majority's analysis and conclusion under those factors.

¶79. *Length of Delay*. This Court has held that a delay of eight months or longer is presumptively prejudicial. *Smith v. State*, 550 So.2d 406, 408 (Miss. 1989). Therefore, the majority is correct in concluding that the delay in this case of approximately 1,000 days, or nearly three years, is presumptively prejudicial, and this factor will weigh against the State.

¶80. *Reason for the Delay*. Part of the delay can be attributed to the defendant for disposal of pre-trial motions and requested continuances. Approximately 480 days of the delay can be attributed to continuances granted at the request of Hull. However, Hull correctly argues that the delay caused by his second motion for continuance should weigh against the state, because the need for a continuance was caused by what the court called "a bombshell in the midst of a trial" dropped by the State. That "bombshell" included first-time disclosure by the State on the second day of trial of three vital pieces of evidence: an answering machine tape containing confessions by Hull of his involvement with Yolanda Butler, the fact that a butcher knife was found under Mr. and Mrs. Hull's bed shortly after the rape, and Hull's confession to Roger Mitchell. Although the continuance was granted at Hull's request, the reasons for this 111 day continuance being necessary were all caused by the State's failure to disclose this evidence prior to trial. That leaves approximately 369 days of delay attributable to the defendant and 631 days attributable to the State. In the similar case of *Vickery*, 423 days of a 1,283 day delay between arraignment and trial were attributable to the defendant, and this Court found that the defendant's right to a speedy trial had been violated. 535 So.2d at 1373-78. Even if some of the delay in bringing Hull to trial was due to the time necessary for handling pre-trial motions, the limited number of court terms available in Sunflower County, or reasonable delay for

purposes of discovery and investigation, there still remains an unreasonable length of delay unaccounted for by the State. "[W]here the defendant has not caused the delay, and where the prosecution has declined to show good cause for the delay we must weigh this factor against the prosecution." *Id.* at 1377 (citing *Perry v. State,* 419 So. 2d 194, 199 (Miss. 1982)). Since the State cannot show good cause for a majority of the 1,062 day delay between Hull's arrest and trial, this factor must weigh against the State.

¶81. *Defendant's Assertion of His Right.* Hull asserted his right on September 3, 1991 in his motion to dismiss for failure to provide a speedy trial, approximately one week after the 270-day rule was violated, i.e. approximately 277 days after Hull's arraignment. The fact that Hull did not make any motion asserting his right to a speedy trial prior to that date does not weigh against Hull, because it is the duty of the State, not the defendant himself, to bring the criminal defendant to trial. *Vickery*, 535 So.2d at 1377. The State must assume that the defendant wants a speedy trial and not presume that he is waiving that right. *Id*. Also, the trial court noted that Hull had effectively asserted his right to a speedy trial in its order denying the State's motion for a continuance on August 28, 1992. Hull then reasserted his right by renewing his motion for dismissal for violation of his right to a speedy trial just prior to his trial on February 1, 1993. Even if Hull had never asserted the right, his right to a speedy trial would have been violated. This Court has previously held that where the only factor weighing against the defendant was assertion of the right, the defendant's right to a speedy trial was violated. Hull did effectively assert his right to a speedy trial, so this factor should weigh in favor of Hull.

¶82. *Prejudice to the Defendant*. The majority finds that this factor should not weigh heavily in favor of the defense, because the only prejudice shown by Hull is some anxiety and concern. I disagree. In *Barker*, the United States Supreme Court outlined three interests shielded by the speedy trial right. 407 U.S. at 532. Hull was prejudiced by the failure of the State to protect two of those interests-- prevention of oppressive pretrial incarceration and minimizing anxiety and concern of the accused. "Moreover, it is clear that an affirmative showing of prejudice is not necessary in order to prove a denial of the constitutional right to a speedy trial." *Flores v. State*, 574 So.2d 1314, 1323 (Miss. 1990) (citing *Trotter v. State*, 554 So.2d 313, 318 (Miss. 1989)). *See also Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188 (1973). Even if Hull had made no showing of prejudice, he would not be precluded from bringing an effective denial of speedy trial claim. *See Burgess v. State*, 473 So.2d 432 (Miss. 1985). However, Hull has shown prejudice in oppressive pretrial incarceration and anxiety and concern, so this factor should weigh in his favor.

¶83. Hull has made an effective showing that all four *Barker* factors weigh in his favor. Applying the balancing test set out in *Barker*, I find that Hull's constitutional right to a speedy trial was violated.

## CONCLUSION

¶84. In light of the foregoing errors committed by the trial court in this case, Hull was denied a fair trial and protection of his rights. I cannot agree with the majority's conclusion that these errors were either non-existent or harmless. Therefore, I must respectfully dissent. I would reverse the conviction of capital rape and reverse the sentence of twenty years in the Mississippi Department of Corrections and remand the case to the Circuit Court of Sunflower County, Mississippi.

**McRAE, J., JOINS THIS OPINION; BANKS, J., JOINS THIS OPINION EXCEPT FOR PART VI.**

**McRAE, JUSTICE, DISSENTING:**

¶**85.** The majority's ruling today denies Mr. Hull the right to a fair trial on several fronts. The trial court erroneously allowed the prosecution to voir dire a defense expert on hearsay evidence which the defendant could not cross-examine. Further, the court incorrectly allowed Jack Quill to testify that other scientists had verified his work as properly done and that DNA patterns matched his conclusions. Both the prosecution's questioning of Dr. Layette and Quill's testimony violate the Confrontation Clauses of our state and federal constitutions. Therefore, I respectfully dissent as to points I and II.

## Dr. Lavette

¶86. The State tried to damage the credibility of Dr. Lavette's testimony by cross-examining him about a review published by Dr. Sensabaugh. This letter from Sensabaugh purported to criticize Levette's claim that the FBI's protocol for examining evidence improperly found a DNA match on Hull. The problem with the State's examination, however, is that it attempted to attack the credibility of Levette on unimpeachable evidence. The article could not be cross-examined, and the author of the article was not present to be cross-examined by Hull.

¶87. The majority asserts that the statements about Sensabaugh's letter could be admissible under the learned treatise exception of our rules of evidence. However, the scope of that rule is limited. Levette could have been cross-examined on the article only if he held the publication out to be authoritative. No such statement was elicited from Dr. Levette at trial, and the record does not reveal that he felt that way. Therefore, this line of questioning was improper.

## Agent Quill

¶88. As a DNA profiler for the FBI, Quill testified that he was able to find a match between Hull's DNA and the DNA from the seminal fluid found on the victim. He also gave testimony that other scientists reviewed his analysis and findings, and that they agreed with his match. None of the scientists or experts, except for Dr. Lavette, was present at trial.

¶89. This evidence was used improperly to bolster Quill's testimony by showing that other experts were in complete agreement that the DNA samples matched. Although it would have been more appropriate to question Quill on the correctness of the procedures used by his laboratory prior to the examination of the DNA, in this case Quill's statements were clearly used to prove that a match existed. Thus, the statements constituted hearsay and, as such, were not admissible. The State may not impermissibly bolster an expert's conclusion through irrelevant repetitions of corroborative opinions solicited from nontestifying colleagues.

¶90. Further, the testimony given by Quill violates the Confrontation Clause. Hull had no opportunity

to cross-examine the other experts who apparently did the DNA analysis. Quill gave hearsay evidence that was not authenticated in any way. None of the scientists' reports were given in tangible form, and Quill never even stated that he relied on the information to form his own opinion. Accordingly, Quill's statements regarding review by other scientists should never have been admitted.

## Dr. Acton

¶91. Admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion. Allowing the expert to testify would create the anomaly that although a party cannot depose an adversary's non-testifying expert, a court can compel the witness to testify at trial. Allowing the State to call Acton as a trial witness and to allude to the fact that he had been retained and later dismissed by the defense would be highly prejudicial. Generally, when an expert formerly retained by a party is allowed to testify for an adverse party, he is restricted from mentioning the prior affiliation.

¶92. Dr. Acton withdrew from the defense team. The fact that he had been retained and later left the defense is highly prejudicial. Testimony that Dr. Acton agreed that a match existed implied that the defense fired him because he agreed with the prosecution, which further implied that Dr. Lavette was a hired gun. His testimony, therefore, should not have been allowed.

¶93. For the above reasons, I accordingly dissent.

**SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.**

1. According to Haller, approximately one in every ten men is a B-type secretor.